EUGENIA SCHWEIKART, GENERAL ADMINISTRATRIX OF THE ESTATE OF WILLIAM SCHWEIKART, DECEASED AND EUGENIA SCHWEIKART, ADMINISTRATRIX *AD PROSEQUENDUM* OF THE ESTATE OF WILLIAM SCHWEIKART, DECEASED, PLAINTIFFS-APPELLANTS, v. SANDY HOOK RESERVATION AUTHORITY, SANDY HOOK STATE PARK AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 7, 1966—Decided November 14, 1966.

On appeal from the Union County District Court.

*Mr. Stanley W. Greenfield* argued the cause for appellants.

*Mr. Joseph A. Hoffman,* Assistant Attorney General, argued the cause for respondents (*Mr. Arthur J. Sills,* Attorney General, attorney).

Before Judges GOLDMANN, KILKENNY and COLLESTER.

The opinion of the court was delivered by
GOLDMANN, S. J. A. D. Plaintiff widow, as general administratrix and as administratrix *ad prosequendum,* sued to recover damages for her husband's pain and suffering, and

for his wrongful death. The original complaint named only the Sandy Hook Reservation Authority (Authority) ; thereafter the complaint was amended to join the State of New Jersey. The answer denied negligence and, by way of separate defenses, set up contributory negligence, sovereign immunity, and the nonexistence of the Authority. After both sides had propounded and answered interrogatories, and the State had deposed plaintiff's sole witness, the State moved for summary judgment on the dual grounds of sovereign immunity and freedom from negligence as a matter of law. The motion was granted on the sovereign immunity ground. Plaintiff appeals from the resultant judgment.

Three grounds for reversal are urged : (1) the Legislature has waived sovereign immunity with regard to actions arising from the operations of the Authority at Sandy Hook State Park ; (2) the operation of a bathing facility by the Authority is a proprietary activity, so that plaintiff may recover for her husband's death by drowning, allegedly the result of the negligence of the Authority's lifeguards, both by way of omission and active wrongdoing; and, finally, (3) the doctrine of sovereign immunity should be overruled.

The operation of the bathing facility at Sandy Hook State Park produces considerable revenue and would ordinarily be considered a proprietary function. *Cf. Weeks v. Newark,* 62 *N. J. Super.* 166 (*App. Div.* 1960), affirmed *o. b.,* 34 *N. J.* 250 (1961) (municipal swimming pool) ; and see, Annotation, "Municipal operation of bathing beach or swimming pool as governmental or proprietary function, for purposes of tort liability," 55 *A. L. R. 2d* 1434 (1957). But in New Jersey this factor does not dispose of the State's immunity from suit—at best it only opens the door to tort liability where a municipality operates the facility. Plaintiff has failed to see the problem in its true dimensions; she cites many cases imposing liability for negligence where the activity is proprietary, and although recognizing that they all involve municipalities, contends that there is "no reason

why the State should not be equally liable." This approach is simplistic in the extreme.

The suit against the Authority is misdirected, and this for the reason that the Authority does not exist and has never existed. The history of the State's acquisition of the Sandy Hook tract from the Federal Government for use as a state park is one of years of fruitless negotiation and disappointment. In 1950 the United States Army finally agreed to vacate the tract, and the report of the "Governor's Committee to Explore the Possibility of Creating a State-Owned Recreational Park at Sandy Hook" recommended that an independent Authority be set up to acquire the land for the State and to construct and operate the facilities. A detailed plan was submitted to the Governor, endorsing the feasibility of operating the park.

The response of the Legislature was the passage in 1950 of the Sandy Hook Reservation Authority Act, *L.* 1950, *c.* 290 (*N. J. S. A.* 13:15–1 to 20). The act created and established in the State Department of Conservation and Economic Development a body corporate and politic, to be known as the Sandy Hook Reservation Authority, which was to acquire, construct, develop, finance and operate Sandy Hook State Park. *N. J. S. A.* 13:15–2. It was to consist of five members, to be appointed by the Governor with the advice and consent of the Senate. *N. J. S. A.* 13:15–3. Among the powers given the Authority was "to sue and be sued in its own name." *N. J. S. A.* 13:15–6(a).

Of particular significance to the instant case is *N. J. S. A.* 13:15–16, which states, in pertinent part, that

"The foregoing sections of this act shall be deemed to provide *an additional and alternative method* for the doing of the things authorized thereby, and shall be regarded as supplemental and additional to powers conferred by other laws, and shall not be regarded as in derogation of any powers now existing; * * *." (Italics ours)

At the time the Legislature was considering the bill of which this section is a part, it also had before it a bill which later

became *L.* 1950, *c.* 316 (*N. J. S. A.* 13 :15–21). The preamble to the latter recited that there was pending in Congress legislation designed to cede and transfer to the State of New Jersey certain lands and interest therein at and adjacent to Sandy Hook. The bill then went on to provide that upon passage of the federal legislation, the Governor, "or such agency as the Governor shall designate," was authorized to accept on behalf of the State such instruments of title as would convey the lands and interest therein, to hold the same subject to appropriate legislative disposition.

*N. J. S. A.* 13 :15–16 ultimately became the controlling feature of the act, since no members were ever appointed to the Authority, nor was the act in any way rendered operational.

On January 8, 1962, some 12 years after the passage of the Sandy Hook Reservation Authority Act, the State acquired Sandy Hook State Park under a lease between the Secretary of the Army and the State of New Jersey by its Department of Conservation and Economic Development (Department). The park was operated by the Department's Bureau of Recreation (see *N. J. S. A.* 13 :1B–3(d)) and, since May 1966, by its Division of Parks, Forestry and Recreation (see *L.* 1966, *c.* 54; *N. J. S. A.* 13 :1B–15.100). All monies for the acquisition, operation and maintenance of the park come from the general treasury of the State.

We cannot agree with plaintiff's contention that the operation of Sandy Hook State Park by the Department amounts to a usurpation of authority; that since the only agency intended by the Legislature to operate the park was the Authority, the State must be considered as having taken on all the powers, duties and responsibilities that would have been the Authority's, including the power to sue and to be sued. Clearly, the Department's operation of the park is the alternative to operation by the Authority contemplated when the Legislature included *N. J. S. A.* 13 :15–16 in the Sandy Hook Reservation Authority Act. That section was the Legislature's response to the suggestion of the Governor's committee that a new and additional way of acquiring the

land and operating the park be made available. It would be entirely unreasonable to infer that the Legislature intended the Authority to be the exclusive means for acquiring and operating Sandy Hook State Park.

█ Since there is not now, and has never been, a Sandy Hook Reservation Authority in existence, and since an agency of the Executive Branch of the State Government is properly operating the park, the Authority's power "to sue and be sued" is irrelevant to the State's claim of sovereign immunity.

Plaintiff's plea that this court overrule the sovereign immunity doctrine is launched on a flood of citations, from both case law and legal literature—all against the background argument that the doctrine has been strongly criticized as unfounded in reason or in legal history. Our own courts have been sensitive to the inequity of governmental immunity—at least in the area of municipal immunity. See, for example, *Cloyes v. Delaware Tp.*, 23 *N. J.* 324, 327–332 (1957), and the observations of this court in *Weeks v. Newark,* above, 62 *N. J. Super.*, at *pages* 177–183. Although our highest court has greatly expanded tort liability in many areas and has criticized the doctrine of the State's sovereign immunity, that immunity has nonetheless been upheld and preserved.

As recently as May 1966 our Supreme Court had this to say in *Fitzgerald v. Palmer,* 47 *N. J.* 106 :

"The State's immunity from suit does not rest upon the notion that the State can do no wrong. Indeed the State can do wrong, so much so that it can expend public moneys to compensate for the wrong it does. In sustaining the legislative power to pay, we explain the State thereby merely recognizes a 'moral' obligation, by which we mean only that the obligation is 'moral' rather than 'legal' because there is no machinery to compel the State to do what in justice it ought to do. Thus the State's 'immunity' involves ultimately the question, which branch of government shall decide for the State when it shall pay? In the abstract, a question of that kind would seem 'judicial' enough, in the absence of a controlling policy expression by the Legislature. But the judiciary could not enforce a judgment if it gave one. No money may be drawn from the State treasury but for

appropriations made by law. *Const. Art.* VIII, § II, ¶ 2. The judiciary could not order the Legislature to appropriate money, or the Governor to approve an appropriation if one were made. * * *"

The court went on to say that it would not render an opinion on the merits, in the hope that the Legislature would respond on its own. Liability was simply too doubtful in that case for the court to engage in an advisory opinion in the delicate area of intragovernmental relations.

Similarly, in the present case there is doubtful liability: the facts indicate that decedent had been fishing all day and was undoubtedly tired; he had had several beers, could not swim, and the water was somewhat rough. Plaintiff is, in fact, suing the State to compel monetary satisfaction of a private claim from the State treasury, and so sovereign immunity applies. See *City of East Orange v. Palmer,* 47 *N. J.* 307, 328–9 (1966).

We therefore conclude that since defendant Authority has no existence and the State is entitled to the protection of the sovereign immunity doctrine, the judgment in favor of defendants must be affirmed.